E-FILED
Tuesday, 25 March, 2025  02:17:54 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GWENDOLYN CALLOWAY and LETINA SLAY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 25-cv-3079 |
| KASTURI KRIPAKARAN, M.D., MICHAEL FITZ, KATHLEEN TREANOR, M.D., SARA BROYLES, and DR. MICHAEL GADSON, | ) ) ) ) ) | |
| Defendants. | ) ) | **JURY DEMAND** |

**COMPLAINT FOR DAMAGES
WITH REQUEST FOR TRIAL BY JURY**

NOW COME the Plaintiffs, Gwendolyn Calloway and Letina Slay, by and through their legal counsel, the Law Offices of Kretchmar and Cecala,P.C., with their *Complaint for Damages with Request for Trial by Jury*, against each of the above-named Defendants, and requests trial by jury, and in support of his Complaint states as follows.

## I.  INTRODUCTION

This is an action brought by Gwendolyn Calloway, an involuntarily committed patient who became pregnant while in the involuntary custody of the Illinois Department of Human Services (IDHS) at Packard Mental Health Center (PMHC) in Springfield, IL, and Letina Slay, Gwendolyn Calloway's mother. The Plaintiffs seek to vindicate profound deprivations of constitutional rights caused by institutionally based abuse, prejudice and persecution.

1

## II.   JURISDICTION AND VENUE

1.      This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the U.S. Constitution, and it is brought pursuant to 42 U.S.C. §§ 1983 and 1988.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 2201.

2.      This case is instituted in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. §1391, as the judicial district in which the majority of relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

## III.   PARTIES

3.      At all times relevant hereto, Plaintiff Gwendolyn Calloway ("Calloway") was a resident of the State of Illinois and a legal resident of the United States of America.

4.      At all times relevant hereto, Plaintiff Letina Slay ("Slay") was a resident of the State of Illinois and a legal resident of the United States of America.

5.      At all times relevant hereto, Defendant Kasturi Kripakaran, M.D. ("Dr. Kashe") was a resident of the State of Illinois and a legal resident of the United States of America. Defendant Dr. Kashe was a senior psychiatrist at PMHC, and was the clinician primarily assigned to formulate and periodically review a mental health treatment plan for Plaintiff Calloway.

6.      At all times relevant hereto, Defendant Michael Fitz ("Fitz") was a resident of the State of Illinois and a legal resident of the United States of America. Defendant Fitz was a Nurse Manager responsible for Lincoln South Clinical Unit at PMHC, where Plaintiff Calloway was housed and treated along with several other patients. He participated in treatment team decisions and the formulation of treatment plans for patients including for Plaintiff Calloway.

2

7.	At all times relevant hereto, Defendant Kathleen Treanor, M.D. ("Treanor") was a resident of the State of Illinois and a legal resident of the United States of America. By information and belief, Defendant Treanor acted as a primary care physician on Lincoln South Unit at PMHC, and participated in treatment team decisions and the formulation of treatment plans for patients, including for Plaintiff Calloway.

8.	At all times relevant hereto, Defendant Sara Broyles ("Broyles") was a resident of the State of Illinois and a legal resident of the United States of America. By information and belief, Defendant Broyles was Facility Director/CEO at PMHC, and acted occasionally as a primary care physician on Lincoln South Unit at PMHC, and participated in treatment team decisions and the formulation of treatment plans for patients on Lincoln South Unit, including for Plaintiff Calloway.

9.	At all times relevant hereto, Defendant Michael Gadson ("Gadson") was a resident of the State of Illinois and a legal resident of the United States of America. By information and belief, Defendant Gadson was Medical Director at PMHC, and acted occasionally as a primary care physician on Lincoln South Unit at PMHC, and participated in treatment team decisions and the formulation of treatment plans for patients on Lincoln South Unit, including for Plaintiff Calloway.

## IV. BACKGROUND FACTUAL SUMMARY AND GENERAL ALLEGATIONS BASED UPON INFORMATION AND REASONABLE BELIEF

10.	Plaintiff Calloway was first diagnosed with mental health problems at the age of sixteen. She was charged with the attempted murder of her mother, the Plaintiff Slay in 2019, and after being found fit to stand trial, she was adjudicated Not Guilty by Reason of Insanity (NGRI) in January, 2020. Her *Thiem* date is January 11, 2045.

3

11.     Plaintiff Calloway was involuntarily committed to PMHC for secure treatment of her mental illness in January, 2020. She was transferred to Elgin Mental Health Center ("EMHC") in July, 2021, and then returned to PMHC on August 12, 2024, where she has been held for treatment on the Lincoln South clinical unit until the time of this Complaint.

12.     Plaintiff Calloway was variously "diagnosed" with schizophrenia, bipolar 2 disorder, and various other mental disorders, at various times by various mental health providers, since she was sixteen years old. None of these supposed "diagnoses" or theories ever included or resulted from medical tests or imaging; and none of them helped her sufficiently with the mental, emotional or behavioral problems she had, or led to any "treatment" to prevent her violent attack on her mother in 2019, which resulted in her being found NGRI.

13.     When Plaintiff Calloway arrived at PMHC in August of 2024, she discovered that she would be housed in a coed dormitory on Lincoln South unit, where rooms for both men and women were located on the same hallway. In her several past hospitalizations for mental health issues, she had never been in this situation of constant close contact with both men and women.

14.     By October or November 2024, Plaintiff Calloway had missed a menstrual period, and suspected that she was pregnant.

15.     Plaintiff Calloway requested that she be provided with a pregnancy test on several occasions beginning in November 2024. Although PMHC is described as a "hospital", the clinicians on Lincoln South were unwilling or unable to provide Plaintiff with such a common diagnostic test until January, 2025. At that time, the test indicated that she was indeed pregnant, and she so informed Defendant Dr. Kashe, Defendant Fitz, and others on her treatment team. These treatment team members were reluctant to believe her.

16.     The Defendants were concerned, first and foremost, with discovering who the father of Plaintiff Calloway's unborn child might be. They were less interested in providing the Plaintiff with anything like proper diet and prenatal care or diagnostic imaging, and indeed they seemed to the Plaintiff to be intentionally withholding such care as a strategy to coerce her into disclosing the father's identity, which she nevertheless refused to do.

17.     Plaintiff Calloway informed the several Defendants that she intended to carry her baby to term and allow the child to be adopted, hopefully by her mother, the Plaintiff Slay, who has indicated that she is able and intends to adopt and raise the child.

18.     Like many or most pregnant women, the Plaintiff Calloway has experienced increases in her appetite and cravings for different foods to nurture the prenatal development of her baby. The Defendants have insisted that she stick to the same diet and the same institutionally provided foods which all patients at PMHC are given, and that she will not be allowed any special treatment. The Plaintiff reasonably believes, from the snide comments and demonstrated hostile or resentful attitudes of staff, that this denial of a diet more suitable to her condition is punishment directed at her for getting pregnant.

## V. THE DEFENDANTS' DELIBERATE AND COMPLICIT ACTIONS, TAKEN UNDER COLOR OF STATE LAW, VIOLATED THE PLAINTIFF CALLOWAY'S RIGHT TO SUBSTANTIVE DUE PROCESS, BY SUBJECTING HER TO UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT

19.     As an NGRI acquittee, the Plaintiff Calloway had a right to *effective* treatment which could help her recover from mental illness. What she got instead was "treatment" amounting to neglect and mental and emotional abuse, which caused serious and possibly irreversible deterioration of her mental health and other severe harm, including an unplanned pregnancy with all its emotional, mental, economic and social implications. The Defendants thereby effectively

rendered any potential for a therapeutic relationship or any possibility of beneficial mental treatment impossible while the Plaintiff remains in their custody.

20.     If *arguendo*, it could be said to be difficult to prevent an occasional pregnancy among the whole population of involuntarily "hospitalized" women on the psychiatric plantations run by the IDHS, then the Defendants would have a duty to better supervise and surveil those who are likely to be fertile; or alternatively it would be prudent to provide them with their own choice of contraception methods. In any event, unplanned pregnancies which occur on a secure "hospital" unit are *ipso facto* a sign of neglect by clinical employees of, or by the whole system, which claims it exists to "help" people (against their will or without their informed consent) to recover from mental illness. The Plaintiffs could conceivably argue this on a *res ipsa loquitur* theory of liability. Such neglect is sufficiently profound to cause any necessary therapeutic relationship to fail.

21.     The Defendants, and each of them, knew the Plaintiff was in IDHS custody ordered by the court entirely and only for the purpose of enabling her recovery from mental illness, providing effective treatment, and for her own and the community's safety: i.e., *not* for punishment or for any personal or financial benefit of the Defendants, or for any mere convenience of PMHC or IDHS, and *not* to risk or endure unplanned pregnancy.

22.     Each of the Defendants knew he/she had a positive duty to prevent sexual activity by the Plaintiff because as an involuntarily committed mental patient, the Plaintiff was legally incapable of consent, and because in the circumstances of legally enforced "hospitalization" and involuntary "treatment", sexual activity (let alone an unplanned pregnancy) would be severely counter-therapeutic. Each Defendant was trained to be constantly alert and to follow prescribed procedures for reporting any observation or suspicion of "boundary violations" including sexual activity, under any guise of rights to social association, or therapy, or psychiatric care.

23.　By information and reasonable belief, the Defendants have an express policy, a widespread practice, or an ingrained, indifferent and inappropriate custom, by which IDHS and PMHC intentionally neglect or turn a blind eye toward such obvious danger of unplanned pregnancies for female NGRI acquittees presented by a coed residential psychiatric unit. Rather than providing sufficient effective supervision or alternatively, contraceptive birth control, the Defendants intentionally fall back on the availability of cheap abortions and presume they can always convince or coerce a woman to go that route. The Plaintiff Calloway refuses, because she and her mother the Plaintiff Slay believe human life is sacred and an unborn child should have the brightest possible future a family can provide. For that belief, the Plaintiffs have become *persona non grata* at PMHC and IDHS. The conditions of Plaintiff Calloway's confinement have thereby been rendered unconstitutional, because the *legally required* effective treatment which could be expected to help her recover from mental illness is not being provided, and *cannot* be provided.

24.　All the Defendants, and each of them, had legal authority and power to affect the Plaintiff's liberty, health, and life, whether as professional staff in a psychiatric "hospital" (PMHC) where the Plaintiff was involuntarily confined by court order, or as administrators in the IDHS with direct responsibility for ensuring that effective "treatment" was provided in a manner that protected the Plaintiff's fundamental rights.

25.　On or about February 4, 2025, the Defendants' cumulative mental and emotional abuse and neglect of the Plaintiff Calloway caused such despondency that the Plaintiff Calloway attempted suicide by cutting her neck and arm with a sharp piece of glass. She had warned her treatment team that she was so despondent shortly before this attempt; however, there was no emergency response, no one on Lincoln South Unit was despatched to protect her. The Plaintiff reasonably concluded that staff wanted her to die to eliminate the legal and political problems she had recently begun to pose for them and their institutions, PMHC and IDHS.

26.    The state court (Circuit Court of MacLean County, Illinois) that ordered the Plaintiff Calloway into the custody of IDHS presumed and was dependent entirely for the administration of justice under the laws and Constitution of Illinois and under the Constitution of the United States, upon the good-faith, professional actions and consistent truthful reports by the Defendants, whom the Court presumed to be experts in mental health. The Defendants, and each of them, intentionally neglected, failed, turned a blind eye, and/or refused to perform those good-faith, professional actions or to provide the truthful reports, upon which the state court depended for administration of constitutional justice and effective protection of its citizens.

27.    The Defendants, and each of them, intentionally neglected, failed, and/or refused to behave in such manner, and/or to follow specific, strict policy and procedures (or even common sense), which they well knew could have and were designed to prevent the Plaintiff's unplanned pregnancy and such severe abuse of the Plaintiff as may have been originally or substantially perpetrated by one or more individuals (to impregnate her), but which was also ultimately permitted, tolerated, ignored, countenanced, coordinated, or intentionally covered up, by all of the named Defendants, and possibly other thus far unidentified PMHC or IDHS employees.

## VI.) CLAIMS FOR RELIEF

**Claim 1 (by Defendant Calloway against all Defendants): Pursuant to 42 U.S.C §1983, Denial of Substantive Due Process of Law under the Fourteenth Amendment to the Constitution of the United States.**

28.    Plaintiffs hereby incorporate Paragraphs 1-27, as if set forth here in their entirety.

29.    Regardless of any appearance that the facial requirements of the Illinois Mental Health and Developmental Disabilities Code (405 ILCS 5/5-100, *et seq.*) were satisfied during the Plaintiff's involuntary confinement in an IDHS facility, each of the Defendants knowingly, and all of them in concert, willfully, and/or recklessly, denied the Plaintiff her fundamental substantive

8

due process rights to bodily integrity, to freedom from cruel and unusual punishment and unlawful seizure, and to medical treatment and effective mental health treatment in the least restrictive environment, as follows:

a. Defendant Dr. Kashe validated and/or adopted one or more "diagnoses" of schizophrenia, bipolar 1 disorder, and/or other mental illnesses, for which Dr. Kashe insists the Plaintiff must be "treated" medically to be cured of the insanity that caused her to commit violence and be charged with attempted murder in 2019. These "diagnoses" were described fraudulently by Defendant Dr. Kashe to both the Plaintiffs Calloway and Slay as diseases of the brain or disorders of brain function which Defendant Calloway "has", and which must necessarily be "treated" with psychiatric drugs. Those drugs may be harmful to the Plaintiff and her unborn child. Such psychiatric drugs are known to not *cure* any objective medical problem, but only to put a patient under severe control for the benefit of others and at the risk of lower life expectancy and unpleasant or even life-threatening side effects. The Plaintiff was never allowed informed consent to the "treatment" which Defendant Dr. Kashe coerced her to accept, because the Plaintiff was never informed of this fundamental risk-benefit imbalance: *lower life expectance and disability, in exchange for no known cure.*

b. Defendant Fitz encouraged the Plaintiff Calloway's whole treatment team to disrespect the Plaintiff as a "nuisance" and "fat" for her unplanned pregnancy. He has insisted that Defendant Calloway should not be provided with a diet more appropriate to her condition and he has refused to consider any change of treatment plan to safeguard her unborn child. By information and belief, Fitz

9

gave other staff confidential information about the Plaintiff's condition, resulting in rumors and ridicule directed toward her from maintenance staff who could only have obtained knowledge of Calloway's pregnancy from him, or from someone under his direct supervision.

c. Defendant Treanor, the acting general physician on Lincoln South clinical unit, failed, neglected and/or maliciously refused to provide appropriate care for the Plaintiff Calloway after knowing she was pregnant. Treanor was one of the first staff at PMHC to know of the Plaintiff's pregnancy; however, she has never taken any initiative or even expressed any concern to provide appropriate medical care or ensure the Plaintiff's safety and the safety of her unborn child.

d. Defendant Broyles has received several specific messages directly from the Plaintiff about her treatment team's neglect and abuse; she has never replied or communicated with her about any of these messages, although the Plaintiff has information and reasonably believes that she did receive her messages, and that she chose to communicate only with the clinical treatment team about the alleged abuse and neglect; she has thereby validated, seconded and participated in the decisions about the Plaintiff's "treatment" made by Defendants Dr. Kashe, Fitz and the clinical team. She has deferred entirely to the clinical treatment team and endowed them with exclusive, total authority to continue the Plaintiff Calloway's unconstitutional conditions of confinement.

e. Defendant Gadson, as the Medical Director at PMHC with authority to oversee all medical treatment on Lincoln South clinical unit, has failed, neglected or refused to recommend or advocate for appropriate care for the Plaintiff

10

Calloway. By information and belief, Gadson was advised of the Plaintiff's pregnancy as a matter of administrative course, immediately after the much-delayed pregnancy test confirmed it; however, Defendant Gadson has never taken any initiative to ensure that appropriate medical care was provided, or to discourage the hostile attitudes, retribution and harassment the Plaintiff has been subject to since staff learned of her pregnancy and her refusal to terminate it for their mere convenience.

30. By their actions and their failures to act, in complete violation of the principles under which any actual hospital or beneficent medical or mental health activity could be expected to operate, the Defendants Dr. Kashe, Fitz, Treanor, Broyles and Gadson, individually and in concert, possibly along with as-yet unnamed other employees of IDHS, established, continued, and refused to mitigate the *unconstitutional conditions of confinement* of the Plaintiff Calloway. They first enforced an arbitrary, demeaning and pseudo-medical "diagnosis" which they then insisted upon "treating" with harmful psychiatric drugs without ever getting the true informed consent of the Plaintiff. Later, after they allowed sexual encounters on Lincoln South Unit, when the Plaintiff requested a simple pregnancy test, these Defendants caused several weeks to pass. The Defendants only reacted with sustained hostility and disrespect to take retribution against the Plaintiff for their own delay and their own failure to enable a simple, *real* medical diagnosis (the Plaintiff was pregnant). Finally, the Defendants denied the Plaintiff Calloway a proper diet to protect her pregnancy and taunted her about their power to do so when she complained.

**Claim 2 (supplemental claim by Defendant Slay against all Defendants): Pursuant to state and/or common law for intentional infliction of emotional distress and loss of familial (child) consortium.**

11

31.     Plaintiffs hereby incorporate Paragraphs 1-28, as if set forth here in their entirety.

32.     Defendants, by their denial of valid medical diagnosis and appropriate medical care, have caused the Plaintiff Slay's daughter, the Plaintiff Calloway, to be arbitrarily and falsely recorded, labelled and categorized as a schizophrenic or bipolar or otherwise seriously mentally ill. This catastrophic status implies serious, permanent neurological defect, yet it can never be disproven. The "diagnoses" alone have changed the relationship between Plaintiff Slay and her daughter, likely for the rest of their lives. Natural family affinities and implicit supports are, and will inevitably continue to be, permanently alloyed and degraded by suspicions, shame and guilt over dependencies and inferiorities which were never real or appropriate, and would never have naturally occurred but for the Defendants' intentional false labels and arbitrary medicalization. The Plaintiffs' opportunity to function and participate as a family in society, or to provide for and look forward to future generations, has been drastically reduced merely because of the speculative and inaccurate or fraudulent "diagnoses" given to Plaintiff Calloway by the Defendants to justify the so-called "treatment" which has no benefit, and which in fact risks serious harm to Plaintiff Calloway and her unborn child, and which was formulated in the first place merely to punish and control, for intentional retribution, and to serve the convenience of these Defendants.

33.     The Defendants' infliction of emotional distress against the Plaintiff Slay was intentional or reckless. They were all, and each of them individually was, aware through long professional training and academic education that the so-called "diagnoses" which they foisted upon Plaintiff Calloway were arbitrary epithets, unverifiable and unfalsifiable by any objective scientific medical procedure. They were also fully cognizant of the risks and potential side effects of the so-called "treatments" they coerced the Plaintiff Calloway to accept without ever adequately informing her of those risks and potential side effects.

34.     The *intention* of these Defendants was to brutally control the Plaintiff Calloway: first of all to serve a false public picture that they are capable of "healing" mental illness and thus justify their salaries and benefits as financed by taxpayers, as well as to support their valuable social status as "doctors"; secondly to convince the Plaintiff Calloway not to take her pregnancy to term and thereby effectively cover up their horrendous failure and consequent liability for refusing or neglecting to protect a disabled person entrusted to their custody by a court.

35.     The loss of family companionship or child consortium suffered by Plaintiff Slay, and the threat to her unborn grandchild has caused severe emotional distress which has interfered, and continues to interfere, with her ability to function in her normal life.

36.     The healing of the trauma from the violent incident Plaintiff Slay suffered at Plaintiff Calloway's hands has been seriously hampered because the Plaintiff Slay has been chronically confused by the Defendants' fraudulent pseudo-explanations of mental illness and their lies about her daughter; and she has been made chronically anxious and depressed by the Defendants' posed, implied, and/or stated threats that she may lose the lives of her daughter and grandchild, or the chance for legal custody of her grandchild.

37.     The concerted conduct of these Defendants, and the individual actions or failures to act by each of them, were outrageous and extreme:

  a. Defendant Dr. Kashe intentionally made up the false story that Plaintiff Calloway was brain damaged or genetically defective and hopelessly incapable of any  normal life as a mother or family/human community member without continuing and probably life-long "treatment" with drugs. She then did her best to gaslight both Plaintiffs Calloway and Slay: first to coerce their performances as subhuman or genetically defective dependents upon her own medical

13

"expertise"; and second, to convince them that Plaintiff Calloway's baby, as irrefutable evidence of her own and her institutions' abuse and neglect, should never be born. By information and belief, she never even spoke to the Plaintiff Slay about her daughter's attempted suicide, or about her unborn grandchild.

b.  Defendant Fitz encouraged the Plaintiff Calloway's whole treatment team to disrespect the Plaintiff as a "nuisance" and "fat" for her unplanned pregnancy. He insisted that Defendant Calloway should be denied any diet more appropriate or suitable to her condition, and he refused to consider any change of treatment plan to safeguard the unborn child. By information and belief, Fitz intentionally refused to dispatch security to Plaintiff Calloway's room for her protection when he had been informed that she was threatening suicide, and he never called the Plaintiff Slay to inform or warn her or to ask her to help.

c.  Defendant Treanor, as the acting general physician on Lincoln South clinical unit, failed, neglected and/or maliciously refused to provide appropriate care for the Plaintiff Calloway after knowing she was pregnant. Treanor never took any initiative, and she refused and enabled others on the unit to refuse, to provide appropriate medical care and proper nutrition, or to ensure the safety of the Plaintiff Slay's daughter and the safety of her unborn grandchild. Plaintiff Slay was thereby left to believe that the treatment team only wished to drug her daughter and cause her to miscarry her baby.

d.  Defendant Broyles was advised by the specific complaints directly from the Plaintiff Calloway about her treatment team's neglect and abuse; Plaintiff Slay knew Defendant Broyles never replied or communicated with her daughter, and

14

he never called to ask her any questions about her daughter either, or to investigate any complaints. He evidently never wondered whether the Plaintiff Calloway had mentioned the abuse and neglect, or complained about it to her mother. The Plaintiff Slay thereby became hopeless and despondent about any improvement for her daughter or any chance for her unborn grandchild's future, because the whole staff at PMHC was clearly collaborating with the decisions about the Plaintiff's daughter's "treatment" made by Defendants Dr. Kashe and Fitz, which were hostile retribution directed at the Plaintiff Slay's daughter, the Plaintiff Calloway, as punishment for the pregnancy which was their own fault for failing to protect a patient in their involuntary care. Defendant Broyles backed them up.

e.  Defendant Gadson, as the Medical Director at PMHC with authority to oversee all medical treatment on Lincoln South clinical unit, failed, neglected or refused to recommend, order or advocate for appropriate care for the Plaintiff Calloway. By information and belief, Gadson was advised of the Plaintiff's pregnancy as a matter of administrative course as soon as the much-delayed pregnancy test had confirmed it; however, Defendant Gadson never tried, as was his professional duty, to ensure that appropriate medical care was provided, or to discourage the hostile attitudes, retribution and harassment the Plaintiff Calloway was subjected to, when staff learned of her pregnancy and her refusal to terminate it for their mere convenience. Gadson's neglect of his duty to protect the Plaintiff Calloway and to ensure proper medical care for her as a pregnant woman was meant to help cover up the failure by other staff to protect

15

Plaintiff Calloway and their complicity in the attempts at retribution against her. Defendant Gadson thus knowingly relegated Plaintiff Slay to her own natural despondency, as though her family were slaves at PMHC.

38 .    The Defendants *intended* to cause Plaintiff Calloway's anxiety, humiliation and depression, because they wanted her to lose her baby. After she had made it clear to them that she intended to carry her pregnancy to term and refused to abort, their strategy became covert mental and emotional torture to purposefully cause trauma and distress. When they were warned that Plaintiff Calloway was suicidal, they intentionally ignored the danger and delayed sending help or security because they wanted the Plaintiff Calloway to die.

39.    To have her daughter in the custody of people who would do such a thing and to have her future grandchild at risk caused severe emotional distress for the Plaintiff Slay. All of the Defendants knew that such severe emotional distress naturally must be caused for the Plaintiff Slay by their treatment of her daughter, although they intentionally disregarded or denied the strong likelihood or near certainty that such severe emotional distress would be caused.

40.    Plaintiff Slay is also entitled to punitive damages on her claims against the individual Defendants personally, to redress their willful, malicious, wanton, reckless, and fraudulent, intentional conduct.

## **Prayer for Relief**

Plaintiffs pray that this Court enter judgment against each of the Defendants, and grant:

A. compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial and in excess of the jurisdictional limit;

B. economic losses on all claims allowed by law;

16

C.  punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial and in excess of the jurisdictional limit;

D.  attorneys' fees and costs associated with this action under 42  U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

E.  pre- and post-judgment interest at the lawful rate, and

F.  any further relief that this Court deems just and proper, and any other appropriate relief at law and equity.

**PLAINTIFFS REQUEST A TRIAL BY JURY.**

Respectfully submitted,

  /s/ S. Randolph Kretchmar
ARDC No. 6275303
(*One of the attorneys for the Plaintiffs*)

The Law Offices of Kretchmar & Cecala, P.C.
1170 Michigan Ave., Wilmette, IL 60091
847-370-5410, srandolphk@gmail.com

17